**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 18-20833 (JJT) |
| | ) | | |
| THERESA A. ROGERS, | ) | | |
|     DEBTOR. | ) | CHAPTER | 7 |
| | ) | | |
| ANTHONY S. NOVAK, TRUSTEE, | ) | ADV. PRO. NO. | 19-02018 (JJT) |
|     PLAINTIFF | ) | | |
| | ) | | |
| V. | ) | RE: ECF NOS. | 1, 7, 24, 29, 43 |
| | ) | | 66, 67 |
| STANLEY J. ROGERS, JR., | ) | | |
|     DEFENDANTS. | ) | | |

## POST-TRIAL MEMORANDUM OF DECISION

I.    INTRODUCTION

Anthony S. Novak, the Chapter 7 Trustee (the "Trustee"), brings this Adversary

Proceeding seeking to avoid the transfer of certain real property located at 29 Yale Street, West

Hartford, Connecticut (the "Property"), which was transferred from Theresa A. Rogers (the

"Debtor") to Stanley Rogers, Jr. (the "Defendant") within two years of the Debtor's bankruptcy,

because the conveyance was made with either actual intent to defraud the Debtor's creditors, or

alternatively, was made for less than reasonably equivalent value. The Trustee initially filed his

four-count Complaint on August 13, 2019 (ECF No. 1, the "Complaint") asserting claims for

recovery of actual and constructive fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A) and

(B), and Conn. Gen. Stat. §§ 52-552e and f. Following the voluntary dismissal of Counts II and

IV, which sought avoidance of the transfer under Conn. Gen. Stat. §§ 52-552e and f, the parties

proceeded to trial on the Trustee's remaining actual and constructive fraudulent transfer claims

(the "Operative Complaint"), which were brought solely under 11 U.S.C. § 548.

The Operative Complaint seeks the avoid the Transfer to the Defendant; award damages to the Trustee in an amount equal to the value of the Transferred Interest; in addition to an award for costs and prejudgment interest and post-judgment interest.[1] In response to the Operative Complaint, the Defendant contends that there was no actual intent to defraud because the Property was transferred in satisfaction of an antecedent debt for reasonably equivalent value. The Defendant further argues that, in the event the Court finds for the Trustee with respect to his fraudulent transfer claim, the Court should allow the Defendant's proof of claim, which was filed in the Debtor's main case (Case No. 18-20833, Claim 13-1; the "Proof of Claim"). In response to the Defendant's Proof of Claim, the Trustee filed an objection (*Id.*, ECF No. 31; the "Objection"), which raised both procedural and substantive objections to the $235,159.60 Proof of Claim for services rendered to the Debtor, in addition to post-transfer improvements to the transferred Property.[2] The Trustee's Objection to the Defendant's Proof of Claim was consolidated with this Adversary Proceeding for trial.

Over the course of the two-day trial held on June 16 and 17, 2020 (ECF Nos. 59, 62; the "Trial"), the Court heard witness testimony and was presented with other evidence relating to the direct and indirect value provided by the Defendant, the circumstances surrounding the transfer of the Property and the nature of the Defendant's post-transfer improvements to the Property. At the conclusion of the Trial, the Court ordered post-trial briefing and took the matter under advisement. The Court heard post-trial oral argument on October 8 and 16, 2020 (ECF Nos. 80, 87). After due consideration of the above, and for the reasons stated herein, the Court hereby GRANTS the relief sought in the Operative Complaint as to Count III for constructive fraudulent

---

[1] According to the Stipulation of Facts filed by the Parties, J. P. Morgan Chase & Co.'s prime rate on April 18, 2019, was 5.5%.
[2] The Court notes that the basis for the Defendant's Proof of Claim is functionally equivalent to the basis for the Defendant's claim that the Property was transferred for reasonably equivalent value.

transfer, but DENIES the relief sought as to Count I for actual fraudulent transfer. The Court further hereby sustains the Trustee's Objection to the Defendant's Proof of Claim and thereby DISALLOWS the Defendant's Proof of Claim in its entirety.

## II.   JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a) and (b)(1). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H) and (O). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.   BACKGROUND AND STATEMENT OF FACTS

Beginning in 2000, the Defendant was frequently called upon to assist with various types of home care for his father, Stanley J. Rogers ("Stanley, Sr.") after he suffered a medical episode. The home care that Stanley, Sr. required included the regular application of feeding tubes, washing and cleaning, standing him up and moving him throughout the home. At some point in 2002, the Debtor and Stanley, Sr. decided to enlist the assistance of an attorney for estate planning purposes. On November 12, 2002, with the assistance of Attorney John G. Tunila ("Attorney Tunila"), the Debtor and Stanley, Sr. executed reciprocal wills that left their respective estates to each other first, and then divided it into thirds between the Defendant, the Defendant's brother, Matthew Rogers, and their grandchild Jacob Rogers.

According to the Defendant, at some point in 2003, despite having just executed wills the previous year assigning only a 1/3 interest to the Defendant, Stanley, Sr. and the Debtor had a conversation with the Defendant where they decided that, due to the amount of ongoing care provided by the Defendant, they would compensate him by leaving him the entire Property.

3

According to the Defendant, partly due to that promise, he continued to provide care to Stanley, Sr. until sometime in 2008, at which point he was no longer able to do so.[3]

According to the Defendant, he nevertheless continued to provide significant improvements to the Property after his father passed away. Years later, in 2016, the Debtor, then age 72, again met with Attorney Tunila. This time, she was concerned that if she herself needed to be placed into an assisted living facility, the State would be able to liquidate the Property to pay for her nursing home care, and indicated to Attorney Tunila that she wanted to protect her home from this possible outcome. Attorney Tunila advised the Debtor that, under Connecticut State regulations, because the Defendant, her adult son, is disabled and receives Social Security Disability Income benefits, she could transfer the Property to the Defendant without affecting her eligibility for Medicaid, and that the State would not be able to later liquidate the Property to pay for her nursing home care. Soon thereafter, the Debtor conveyed the Property to the Defendant, reserving for herself a life use in the Property.

Approximately 1 year and 9 months later, in May of 2018, the Debtor filed a Chapter 7 petition in this Court. The Transfer was not disclosed on the Debtor's bankruptcy schedules. After the Transfer was discovered by the Trustee, the Trustee sent a demand letter to the Defendant and later initiated this Adversary Proceeding.

In accordance with Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052, this Court makes the following additional Findings of Fact to supplement those previously advanced in the Introduction and Background of this Memorandum of Decision:

---

[3] Stanley, Sr. passed away in January of 2012, at which point, his estate passed to the Debtor.

1. The Debtor filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code (the "Code") on May 25, 2018, Case Number 18-20833 (JJT), which remains pending before this Court.

2. The subject Property is the Debtor's principal residence.

3. The Defendant is the Debtor's son.

4. In the Debtor's bankruptcy schedules, she failed to disclose any ownership interest in the Property.[4]

5. On or about August 30, 2016, the Debtor transferred her interest in the Property to the Defendant (the "Transfer"), reserving for herself a life use, by virtue of a Quit Claim Deed that bears the same date, and recorded in the Land Records of the Town of West Hartford on September 6, 2016, at Volume 5011, Page 344 (the "Deed").

6. At the time of the Transfer, the Debtor was the record owner of the Property.

7. Attorney Tunila advised the Debtor with respect to the Transfer.

8. Attorney Tunila or his office drafted the Deed and Attorney Tunila signed and filed a conveyance tax return.

9. The Deed states that the Transfer of the Property was for no consideration.

10. The conveyance tax return provides (under penalty of perjury) that the Transfer was for no consideration or less than $2,000.00, and no conveyance tax was paid in connection with the Transfer.

11. After the Transfer, the Debtor filed no gift tax return and the Defendant filed, or caused to be filed, a 2016 United States Income Tax Return, that did not reflect the tax consequences of the Transfer.

12. As a result of the Transfer, the Defendant acquired a fee simple interest in the Property, subject to the Debtor's life use.

---

[4] The Debtor also failed to include certain mortgagees in her bankruptcy schedules and listed Chase Bank and Santander Bank, two of the mortgagees, as unsecured creditors.

13.  The Transfer was made within two years of the Petition Date.

14.  On the date of the Transfer, the Debtor was insolvent.[5]

15.  At the time of the Transfer, the Property was encumbered by the following interests:

    a.  A mortgage originally in the name of FT Mortgage Companies, and subsequently assigned to Metlife Bank, National Association, and further assigned to JPMorgan Chase Bank, National Association, with a balance of $39,374.67 owed on the date of the Transfer, recorded on the West Hartford Land Records on May 3, 1999, at Volume 2436, Page 87.

    b.  A Lien Notice to the Town of West Hartford, with a balance of $0 owed on the date of the Transfer, recorded on the West Hartford Land Records on July 22, 1999, at Volume 2466, Page 212.

    c.  A mortgage to the Town of West Hartford, with a balance of $21,872.22 owed on the date of the Transfer, recorded on the West Hartford Land Records on September 15, 1999, at Volume 2485, Page 294.

    d.  A mortgage to Sovereign Bank, n/k/a Santander Bank, with a balance of $7,252.73 owed on the date of the Transfer, recorded on the West Hartford Land Records on April 3, 2003, at Volume 3153, Page 328.

16.  According to an appraisal of the Property, at the time of the Transfer, the value of the Property was $145,000, with the equity in the Property being $76,511.40. Pl's Ex. 22, p. 11; the "Appraisal").

17.  The life estate was valued at approximately $22,329. *Id.*

18.  The stipulated value of the interest that was transferred to the Defendant (i.e., fee simple subject to a life use) was $54,000. *See* Statement of Uncontested Facts (ECF No. 43, p. 4).[6]

19.  The Debtor did not disclose the Transfer on her Statement of Financial Affairs. Case No. 18-20833, ECF No. 1, pp. 35–36.

---

[5] According to the Defendant's Statement of Uncontested Facts (ECF No. 43), the Defendant concedes that the Debtor was insolvent at the time of the transfer.

[6] According to the Statement of Uncontested Facts (ECF No. 43, p. 4), the Defendant stipulated that the value the transferred interest in the Property was $54,000. In the Defendant's Post-Trial Brief (ECF No. 66), however, the Defendant argued that the stipulated value of the transferred interest was arrived at by mutual mistake. After a hearing on the stipulated value of the transferred interest, the Court declined to afford the Defendant relief from the stipulation, finding an absence of *mutual mistake,* other good and sufficient cause and prejudice to the Chapter 7 Trustee (ECF No. 84).

20. In 2016, prior to the Transfer, as part of a mortgage application on his own residence, the Defendant failed to disclose that he had an interest in the Property which he obtained in satisfaction of an obligation owed to him by the Debtor.

21. During the course of these proceedings, no written instrument was produced that indicated the Defendant's continued care of Stanley, Sr. was conditioned on or done in exchange for, or in expectation of, compensation.

22. The Defendant acknowledged that he was aware of the provision under his parents' wills, which granted him a 1/3 interest in the Property.

23. The Debtor acknowledged that, despite the alleged promise to the Defendant, the wills remained unchanged during the period that the Defendant provided care to Stanley Sr. Pl. Ex. 26, p. 14.

24. At Trial, the Defendant testified that he (as a dutiful son) provided care for his father because he loved him and that he would had done so even if he did not receive the Property as compensation.

25. The Defendant began providing care to Stanley, Sr. in 2002, prior to when the alleged promise for compensation was made.

26. The Defendant filed his Proof of Claim on August 26, 2019 for $235,159.60, which included a schedule of expenses that allocated approximately $180,150.60 to care for his father with the balance of approximately $54,009 going to alleged improvements to the Property.

27. At Trial, the Defendant testified to the nature and amount of the entries contained in schedule of expenses.

28.   The Defendant also submitted into evidence some scant receipts and invoices that he allegedly paid pertaining to the maintenance of the Property.[7] The receipts admitted totaled approximately $8,077.05.

29.   There was a glaring deficiency of documents supporting the entirety of the Claim.

30.   In 2005, the Debtor and Stanley, Sr. filed a voluntary Chapter 7 bankruptcy petition in the District of Connecticut (Case No. 05-20316; the "2005 Bankruptcy") and received their discharge on May 9, 2005.

31.   In the Debtor's 2005 bankruptcy case, she did not list the Defendant as a creditor on her bankruptcy schedules nor was there evidence that the Defendant filed any proof of claim in that case.

IV.   DISCUSSION

a.   Fraudulent Transfer Pursuant to 11 U.S.C. § 548

Under Section 548, a "trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily— (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii) . . . was insolvent on the date that such transfer was made or

---

[7] All of the invoices and receipts that were admitted into evidence in support of the Defendant's Proof of Claim were in the name of the Debtor and not in the name of the Defendant.

such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . ." 11 U.S.C. § 548.

### i.   Actual Fraudulent Transfer

The Trustee alleges in the Operative Complaint, that the facts support an inference of actual fraudulent intent. Section 548(a)(1)(A) of the Code requires that the Complaint allege that the Defendants act with "actual intent" to "hinder, delay or defraud" the creditor. *See* 11 U.S.C. § 548(a)(1)(A). "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). When alleging fraud, however, "[c]onclusory allegations of scienter are sufficient if supported by facts giving rise to a strong inference of fraudulent intent." *Nat'l Council on Comp. Ins., Inc. v. Caro & Graifman, P.C.*, 259 F. Supp. 2d 172, 179 (D. Conn. 2003) (internal quotation marks omitted). "Actual fraudulent intent may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusual nature of the *transaction*." *Id.* (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir.1995)) (emphasis added).

The evidence adduced at Trial supports the conclusion that the Transfer was contemplated and executed in furtherance of the Debtor's Medicare planning. While Medicare planning that results in the transfer of assets from an individual who is eligible to receive future Medicare benefits to another is, in the most generic and attenuated sense, an attempt by that individual to preserve assets from creditors, the facts here do not support the conclusion that this was an instance of actual fraud. Principally, the Medicare planning at issue was an attempt by the Debtor to take advantage of existing and lawful avenues to protect assets from *future* creditors in the event she required *future* medical care if she was ever placed in an assisted living facility. While the Trustee has also drawn attention to the various defects and omissions in the Debtor's

schedules as indicia of fraudulent intent, which are potentially problematic for other reasons, the Court concludes that those defects and omissions, under the circumstances, do not compel a conclusion that the *Transfer* of the Property, *at the time it was made,* was done so with actual intent to hinder, delay or defraud the Debtor's creditors as required by 11 U.S.C. § 548(a)(1)(A). Accordingly, the Court hereby DENIES the relief sought in the Operative Complaint as to Count I.

      *ii.  Constructive Fraudulent Transfer*

    At the outset, the Parties are in agreement that the Transfer was made within two years of the Debtor's bankruptcy filing and that the Debtor was insolvent at the time of the Transfer. *See* ECF No. 43, pp. 2–3. The Trustee's principal focus, therefore, has been whether the Debtor received less than a reasonably equivalent value in exchange for the Transfer. The Defendant, however, contends that reasonably equivalent value was given in exchange for the Transfer because it was based upon years of personal care that he provided to the Debtor's husband, Stanley, Sr.

    A "bankruptcy trustee is permitted to avoid any transfers within [two] year[s] of the filing date . . . for which the debtor did not receive reasonably equivalent value, and at which time the debtor was insolvent or because of which the debtor became insolvent. . . . The Trustee must prove the elements of a constructive fraudulent transfer claim by a preponderance of the evidence. . . . To decide whether funds were exchanged for a reasonably equivalent value, the court is required to determine the value of what was transferred compared to the value of what was received. . . . There need not be dollar-for-dollar exchange, but the court must keep the equitable purposes of the statute firmly in mind, recognizing that any significant  disparity between the value received and the obligation assumed by either issuer will have significantly

harmed the innocent creditors[.]" *In re LXEng, LLC*, 607 B.R. 67, 95 (Bankr. D. Conn. 2019) (citations and internal quotation marks omitted).

"In determining whether a debtor has received reasonably equivalent value in a transfer, courts undertake a two-step inquiry: first, a court must determine 'whether the debtor received any value at all in exchange for the transfer; i.e. any realizable commercial value as a result of the transaction,' and second, a court must determine "whether that value was in fact reasonably equivalent . . . ." *In re Lyondell Chem. Co.*, 567 B.R. 55, 113–14 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018) (citations omitted); *see also Mellon Bank v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.*), 92 F.3d 139, 149 (3d Cir. 1996) ("[B]efore determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court must make an express factual determination as to whether the debtor received any value at all"). "The Bankruptcy Code defines 'value,' for purposes of section 548, as 'property, or satisfaction or securing of a present or antecedent debt of the debtor . . . .' 11 U.S.C. § 548(d)(2)(A). Under this definition, value is limited to economic benefits that preserve the net worth of the debtor's estate for the benefit of creditors." *In re Knight*, No. 15-21646 (JJT), 2017 WL 4410455, at *3; *see also Rubin v. Manufacturers Hanover Tr. Co.*, 661 F.2d 979, 992 (2d Cir. 1981) (applying the Bankruptcy Act) ("The decisions in fact turn on the statutory purpose of conserving the debtor's estate for the benefit of creditors"); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638–39 (2d Cir. 1995) (To determine whether a debtor indirectly received reasonably equivalent value, "the fact-finder must first attempt to measure the economic benefit that the debtor indirectly received from the entire transaction, and then compare that benefit to the value of the property the debtor transferred").

At Trial, the Defendant produced witnesses who worked as home care givers for Stanley, Sr., and who testified to the kind of care that was required and the rates that they charged. This evidence arguably established some basis for the Court to evaluate the alleged indirect value provided by the Defendant. The Defendant, however, has failed to offer any documents, invoices, receipts, or other kind of contemporaneous record with respect to these services. In essence, the Defendant has provided the Court with no reliable way to quantify with particularity the alleged value provided.

Even if the Court was to rely solely on the Defendant's testimony as to the time spent, this testimony, provided some eight to twelve years after said services were rendered, presents only the Defendant's best guess as to the amount of time he cared for Stanley, Sr. While this may seem to be too exacting of a standard under the circumstances, this Court has previously addressed issues of a similar nature, ones that specifically pertained to quantifying indirect value for care to a close relation; *see In re Fritzson*, 590 B.R. 178, 183 (Bankr. D. Conn. 2018). Here, in contrast to the facts of that case, because the Defendant kept no contemporaneous records of any kind for the time spent caring for his father, there is a significant impediment to determining what value, if any, was afforded to the Debtor. The Court, therefore, finds that Defendant's testimony with respect to the amount of time he cared for Stanley, Sr. is unreliable for the purposes of establishing what value was exchanged.

While the dearth of quantifiable evidence supporting the Defendant's contentions significantly undercuts his position, there exists a second, even more fatal flaw to the Defendant's theory of this case. Simply put, "[m]oral or familial obligations cannot be considered in the value analysis for the obvious reason that the depletion of resources available to creditors cannot be offset by the satisfaction of moral obligations. . . . As cold and

unsentimental as that rule might seem, it is easier to understand from the perspective of creditors, most of whom would probably be unwilling to volunteer to provide a financial subsidy to enhance the insolvent debtor's family relationships by allowing the debtor to put valuable property beyond their reach. . . . Indeed, carving out an exception for transfers that satisfied intangible social obligations would also violate the plain language of the Bankruptcy Code. Whereas the definition of value under section 548 includes 'satisfaction . . . of a . . . debt of the debtor,' 11 U.S.C. § 548(d)(2)(A), the Code defines 'debt' as 'liability on a claim,' and 'claim' refers to a right to payment or to an equitable remedy for breach of performance. 11 U.S.C. §§ 101(5), (12). These definitions plainly exclude intangible debts, whether they take the form of moral, familial or even spiritual obligations." *In re Knight*, *supra*, 2017 WL 4410455, at *3 (citations omitted).[8]

On multiple occasions during the Defendant's Testimony during Trial, the Defendant stated that he cared for his father out of love and would have done so even if he was not offered the Property as compensation. While it is not lost on this Court that the Defendant's care of his father was likely a major unselfish commitment, one undertaken because of a strong moral obligation, these services simply do not satisfy the requirements of 11 U.S.C. § 548(d)(2)(A). Because the services described by the Defendant were provided on account of a moral or familial obligation, the Defendant's claim that he provided reasonably equivalent value for the Transfer must regrettably fail under the law.

---

[8] *See also Zeddun v. Griswold*, (*In re Wierzbicki*), 830 F.3d 683, 689–90 (7th Cir. 2016) (*citing In re Bargfrede*, 117 F.3d 1078, 1080 (8th Cir. 1997)) (non-economic benefits in the form of a release of a possible burden on the marital relationship and the preservation of the family relationship cannot confer reasonably equivalent value under section 548 because they are sufficiently analogous to other intangible, psychological benefits); *In re Treadwell*, 699 F.2d 1050, 1051 (11th Cir. 1983) (love and affection do not constitute 'reasonably equivalent value' under section 548).

While the Court's analysis of this issue would ordinarily end here, the Court agrees with the Trustee that, even assuming that some quantum of value was provided by the Defendant, Section 548 requires that said value was given "*in exchange*" for *a legally enforceable promise,* and that because the alleged oral promise to compensate the Defendant for his services pertains to the transfer of real property, the statute of frauds bars any claim that Defendant had an *enforceable* contract with the Debtor.

Under the doctrine of the statute of frauds, certain contracts are not enforceable unless reduced to writing. *See Red Buff Rita, Inc. v. Moutinho*, 151 Conn. App. 549, 554–55 (2014). The purpose of this doctrine is to require that parties present reliable evidence of the existence and the terms of the contract in certain circumstances. *Id*. Connecticut General Statutes Section 52–550(a) provides in relevant part: "No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property . . . ."

While Connecticut statutes require that contracts for certain types of promises be reduced to a writing, the Connecticut Supreme Court explained that there are "circumstances in which a contract may be enforced despite its noncompliance with the statute of frauds . . ." *Red Buff Rita, Inc. v. Moutinho*, *supra*, 151 Conn. App. 555 (referencing *Glazer v. Dress Barn, Inc*., 274 Conn. 33, 59–63 (2005)); and that the doctrine of part performance, often referred to as equitable estoppel, is one of those circumstances. *Id*. The Defendant contends that he has satisfied the doctrine of part performance and, therefore, the Debtor's promise to the Defendant is legally enforceable.

14

Pursuant to Connecticut law, "the elements required for part performance are: (1) statements, acts or omissions that lead a party to act to his detriment in reliance on the contract; (2) knowledge or assent to the party's actions in reliance on the contract; and (3) acts that unmistakably point to the contract." *Glazer v. Dress Barn, Inc.*, *supra*, at 62. "Under this test, two separate but related criteria are met that warrant precluding a party from asserting the statute of frauds. . . . First, part performance satisfies the evidentiary function of the statute of frauds by providing proof of the contract itself. . . . Second, the inducement of reliance on the oral agreement implicates the equitable principle underlying estoppel because repudiation of the contract by the other party would amount to the perpetration of a fraud." *Id.* (citations and internal quotation marks omitted.)

Connecticut decisional law instructs that "the acts of part performance be such acts as alter the relations of the parties . . . [and] be of such a character that they can be naturally and reasonably accounted for *in no other way* than by the existence of some contract in relation to the subject matter in dispute." *Id.,* at 67 (citation omitted; emphasis added; internal quotation marks omitted). "Thus, [Connecticut courts] have rejected acts offered as evidence of part performance when they do not compel the inference that there was some contract by which these acts were required of the plaintiff[s] and therefore explainable upon no other theory. . . . If the acts are reasonably explicable on some other ground . . . they are not sufficient to take the case out of the statute [of frauds]." *Id.* (citations and internal quotation marks omitted).

In support of his contention that the alleged promise is legally enforceable despite the absence of a writing, the Defendant has attempted to cast the Transfer as prima facie evidence of the existence of the alleged promise. The Defendant also points to the fact that it would be unreasonable to believe that the Defendant would continue improving the Property if he wasn't

genuinely expecting to be compensated for doing so. First, the record casts serious doubt on whether there was ever such an agreement between the Debtor and the Defendant. There is no indication that, prior to the Transfer, the Debtor or Stanley, Sr. altered their 2002 wills providing the Defendant a 1/3 interest in the Property so as to update them with respect to this new promise. Additionally, the credible testimony of Attorney Tunila indicated that the only disclosed purpose for the Transfer was for the Debtor's Medicare planning. This conclusion is further supported by the Deed, which make no mention of an antecedent debt owed to the Defendant.

What's more, the Defendant's 2016 federal tax return does not indicate that the Defendant received any compensation in 2016 in satisfaction of an antecedent debt. While the Debtor and the Defendant, nevertheless, testified that there was such an oral agreement between them, the Court finds the Debtor's and Defendant's testimony wholly unsupported by any other fact in the record and ultimately not credible with respect to this issue. The fact that the Deed, transaction papers and tax returns filed as part of the Transfer, in addition to the testimony of Attorney Tunila, support the conclusion that the Transfer of the Property to the Defendant was a *gift* made in the furtherance of the Debtor's Medicare planning, and not made as consideration for an antecedent debt.

Second, even if such a promise did exist, the facts adduced at Trial do not satisfy the requirements of part performance for the simple reason that the Defendant's actions can be explained in some other way than by the existence of an agreement. For example, in keeping with the Defendant's testimony, and that of being a good son, one entirely plausible alternative explanation for the Defendant's care of Stanley, Sr. and the continued improvements to the Property, is that he is simply taking care of his family—because he loves them. Moreover, it is

significant that the Defendant's own admissions indicate that he began caring for Stanley, Sr. well *before* there was any alleged promise for compensation. Ultimately, the Defendant's own testimony that he would have assisted his father whether or not he was promised the Property fundamentally rebuts any presumption that future compensation was the *only* basis for his actions. *See Glazer v. Dress Barn, Inc*., *supra*, 274 Conn. at 68 ("[i]f the acts are reasonably explicable on some other ground, they are not sufficient to take the case out of the statute [of frauds]").[9] Accordingly, the Court finds, that the Defendant has failed to establish the elements of part performance as a defense to the statute of frauds.

Because the Transfer took place when the Debtor was insolvent and within two years of the Debtor's bankruptcy, and because the services rendered by the Defendant are of a kind not recognized by the Code as providing value to a debtor, and because the Defendant has failed to prove that the transfer was made in satisfaction of an antecedent debt, one which was based upon a legally enforceable agreement, the Court hereby GRANTS the relief sought by the Trustee in the Operative Complaint as to Counts III.

   b.   The Defendant's Proof of Claim

Before addressing the merits of this issue, the Court notes that it is anomalous for the Defendant to argue: (1) that he has already been compensated for the services he rendered to his father (in the form of the Transfer); while also claiming (2) that he holds a legally enforceable claim against the estate for those very same services. At the post-trial argument before this Court, the Defendant conceded that this position was logically inconsistent, but nonetheless argued that the Proof of Claim should not be disallowed because it would unduly elevate form

---

[9] The Court further notes that if there was an enforceable agreement made in 2003 between the Debtor and the Defendant, any such liability on that obligation was likely discharged in her 2005 Bankruptcy and thus, the promise to transfer the Property to the Defendant would be of no force and effect.

over substance, and in the event the Court found for the Trustee on the fraudulent transfer issue, the Defendant's Proof of Claim would be ripe for adjudication. While the claims are indeed incongruous, in light of this Court's determination finding in favor of the Trustee with respect to Count III, the Court agrees that the Defendant's Proof of Claim is being advanced in the alternative and that it may be addressed at this juncture.

The Proof of Claim at issue was filed by the Defendant on August 26, 2019 and states a claim for $235,159.60. Attached to the Proof of Claim, is a schedule of expenses that attempts to allocate portions of the total claim to various line items and activities. According to the attached schedule of expenses, $181,150.60 of the Proof of Claim is allocated to care for Stanley, Sr., beginning in 2000 and ending in 2008. There is also an entry for a replacement of the Property's HVAC system in 2006 for $5,000. The balance of entries, which amounts to $49,009, is for post-transfer improvements to the Property made during 2016 through the present, which the Defendant now claims as a good faith transferee pursuant to 11 U.S.C. § 550(e).

A proof of claim filed against an estate is presumptively valid if accompanied by certain forms of proof. *See* 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects."); Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."). That presumption may be challenged by producing evidence calling the validity of the proof of claim into question. In the event that a proof of claim's validity is challenged, it is incumbent on the creditor to substantiate its claim by producing supporting evidence.

Here, the Court concludes that the Trustee has successfully rebutted the presumption that the Defendant's Proof of Claim is valid by calling into question the accuracy and precision, as well as the underlying basis for, the amount claimed. Therefore, whether the Defendant's Proof of Claim shall be allowed rests on whether the Defendant has furnished this Court with sufficient evidence in order to substantiate it. At Trial, the Defendant relied principally on his own testimony, the testimony of the Debtor, and the testimony of his brother in support of his Proof of Claim. The Defendant also offered various receipts (*See* Def.'s Exs. 6–7, 9–10) that he argues represent a cross section of expenses that he has paid during the post-transfer period, and which total approximately $8,077.05.

For the same reasons discussed previously, the majority of the Defendant's Proof of Claim fails because it pertains to acts that either do not establish value under the Code or that were done as part of an agreement that was of no legal force and effect. Accordingly, the portion of the Defendant's Proof of Claim for $181,151.60 for care rendered to Stanley, Sr., is hereby DISALLOWED. Furthermore, the Defendant's claim of $5,000 for the replacement HVAC in 2006, in addition to being unsubstantiated by any documentary proof admitted into evidence, is well beyond the applicable statute of limitations, *see* Conn. Gen. Stat. § 52-576; and, therefore, is also premised on a legally unenforceable claim. The Trustee's Objection as to that portion of the Claim is SUSTAINED and, accordingly, it is DISALLOWED.

With respect to the Defendant's remaining claim for $49,009 for post-transfer improvements to the Property pursuant to Section 550(e), the record presented to this Court leads the Court to question whether the Defendant actually paid for any of those improvements himself. Critically, none of the receipts are in the Defendant's name, and instead are in the name of the Debtor. While this was explained away at Trial, the Court is not convinced. Furthermore,

19

the Court is hard pressed to see why it should credit the Defendant's claim that he paid the Debtor's mortgage on the Property for an entire two-year period, spanning from 2016 to 2017, without any substantiating evidence. Tellingly, when the Defendant was examined by the Trustee as to whether he had proof of any payment for such expense, the Defendant stated that he had none. The explanation provided was that he would simply give the Debtor cash each month for the mortgage. However, when the Trustee examined the Debtor, she testified that her mortgage payments were made through an automatic withdrawal from her bank account on a monthly basis by the mortgage servicer. It is hard for the Court not to point out that had the Defendant provided bank statements from the Debtor's account that serviced her mortgage, he could have very well have tied any such cash deposits to his claim for payments on the mortgage. No such evidence was ever offered by the Defendant or the Debtor.

While both the Defendant and the Debtor testified that the Defendant paid for the improvements to the Property identified in the Defendant's Proof of Claim, the Defendant has failed to produce any documentation that supports this testimony. Given that proof of payment *could* have been readily produced, the Defendant's failure to produce such evidence is highly prejudicial to his claim. Accordingly, the remainder of the Defendant's Proof of Claim is also hereby DISALLOWED.

c.   The Relief Sought by the Trustee

The Trustee seeks to avoid the Transfer, take possession of the interest in the Property transferred to the Defendant and obtain a judgment for money damages. At a minimum, the Trustee seeks to have the Court avoid the transfer and return the transferred interest in the Property to the Estate. The Defendant contends that, in the event the Court finds for the Trustee, because the allowed claims in this case totals $22,858.10, the Trustee should only be permitted to

recover up to that amount, plus administrative costs.[10] Defendant's Post Trial Brief, p. 14 (citing to *In re Murphy*, 331 B.R. 107 (Bankr. S.D.N.Y. 2005) in support of that proposition). In response, the Trustee argues that because the pool of potential creditors is, in fact, larger than the allowed claims pool, and because late filed claims in a Chapter 7 bankruptcy are typically allowed so long as timely claims are paid first, any recovery should not be reduced.

First, with respect to the legal authority cited by the Defendant in support of his contention that a reduction is warranted, the case cited to is inapposite from the present circumstances and instead stands for the *disputed* proposition that, in the event there is a constructive fraudulent transfer recovery by a trustee that would result in a windfall to a debtor, courts may have some discretion in limiting such a windfall. As articulated by the Trustee, given that the potential universe of claims depicted in the Debtor's schedules is indeed greater than the allowed claims in this case, the Court declines to limit the Trustee's recovery.

Second, in the event a fraudulent transfer is avoided, the choice of whether the transferred property is returned to a trustee or whether the court renders a judgment for money damages is one that is entirely within the court's discretion. *Hirsch v. Gersten* (*In re Centennial Textiles*), 220 B.R. 165, 176-177 (Bankr. S.D.N.Y. 1998), *corrected by* 220 B.R. 177 (Bankr. S.D.N.Y. 1998). "[S]ince the Bankruptcy Code does not provide guidance on when the Court should order payment of the value of property rather than order the return of property itself, it is within the Court's discretion to make such a determination. . . . The factors which the Court should consider in determining whether to order turnover of the property rather than payment of the value include

---

[10] At the post-trial argument, the Trustee represented that the Estate's administrative claims would consist of Counsel's out of pocket expenses, which were approximated at $4,400, the Trustee's fees and costs, which approximated $5,950, in addition to the 1/3 contingency fee on the $54,000 recovery ($18,000). Adding these figures to the allowed claims of $22,858.10, you get $51,208.10, which is approximately $2,800 shy of the amount sought by the Trustee.

whether the value of the property (1) is contested; (2) is not readily determinable; or (3) is not diminished by conversion or depreciation." *Id*. (citations omitted). While the value of the Property transferred to the Debtor is not materially in dispute, the Court concludes that the Trustee's request for both a judgment of money damages and the return of the transferred property is an appropriate remedy under the circumstances.[11] In order to potentially mitigate the harshness of this disposition upon the Defendant and the Debtor, and in the interest of justice, the Court has sequenced the remedies herein to afford the Defendant an opportunity to satisfy the Judgment with the timely payment of monies.

## V.    CONCLUSION

Accordingly, Judgment shall enter in favor of the Defendant and against the Plaintiff as to Count I of the Operative Complaint alleging Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A) and shall enter in favor of the Plaintiff and against the Defendant as to Count III of the Operative Complaint alleging Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B). The Transfer is avoided under 11 U.S.C. § 548(a)(1)(B), is recoverable under 11 U.S.C. § 550 and is preserved under 11 U.S.C. § 551. The Trustee is awarded money damages in the amount of $54,000, in addition to pre-judgment interest at the rate of 5.5%, as well as post-judgment interest in accordance with the prevailing federal judgment interest rate. Furthermore, the Trustee's Objection to Claim is hereby SUSTAINED, and the Defendant's Proof of Claim 13-1 is thereby DISALLOWED in its entirety.

In the event the money damages are paid to the Trustee within 90 days from the date of the entry of this Memorandum of Decision, the Judgment shall be deemed satisfied. In the event that the Judgment remains unsatisfied at the end of that 90-day period, the Defendant shall, with

---

[11] Because a trustee is only entitled to one satisfaction of an avoided transfer; *see* 11 U.S.C. § 550(d); the relief granted herein, in fact, provides the Defendant with alternative option as to how he satisfies the Judgment.

all deliberate speed, convey the transferred interest in the Property to the Trustee in satisfaction of the Judgment. The Trustee shall deliver a form of quitclaim deed to the Defendant and his counsel within 30 days hereof so as to assure a good title transfer to the bankruptcy Estate.

The Defendant, the Debtor or their agents are hereby restrained, prohibited and enjoined from any alteration, modification, disposition, mortgaging or encumbering of the Property until further order of the Court. In the event that the Defendant is able to obtain a mortgage on the Property to resolve this matter within the 90-day period proscribed above, the Defendant may move for expedited relief from the Order of Judgment so as to close on the transaction and pay over the proceeds in satisfaction of the Judgment. Lastly, the Trustee, with all deliberate speed, shall file a copy of the Judgment upon the Land Records of the Town of West Hartford, Connecticut.

A separate Judgment consistent with this Memorandum of Decision shall issue upon the Docket.

**IT IS SO ORDERED** at Hartford, Connecticut this 5th day of January 2021.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut